# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| SANDRA KAY GUIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:15-cv-02027-JEO |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION**

Plaintiff Sandra Kay Guin brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of Social Security[1] ("Commissioner") denying her application for disability insurance benefits. (Doc.[2] 1). The case has been assigned to the undersigned United States Magistrate Judge pursuant to this court's general order of reference. The parties have consented to the jurisdiction of this court for disposition of the matter. (Doc.

---

[1] Nancy A. Berryhill was named the Acting Commissioner on January 23, 2017. *See* https://www.ssa.gov/agency/commissioner.html. Under 42 U.S.C. § 405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office." Accordingly, pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Nancy A. Berryhill for Carolyn W. Colvin in the case caption above and **HEREBY DIRECTS** the clerk to do the same party substitution on CM/ECF.

[2] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

14). Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

On October 29, 2012, Guin filed an application for a period of disability and disability insurance benefits, alleging disability beginning December 21, 2010. (R.[3] 51, 157-58). Her application was denied initially and on reconsideration. (R. 51-52). Guin then requested a hearing before an Administrative Law Judge ("ALJ"). (R. 61-62). The hearing was held on June 17, 2014. (R. 23-40). Guin, her counsel, and a vocational expert attended the hearing. (R. 23). The ALJ issued a decision on July 7, 2014, finding that Guin was not entitled to benefits. (R. 12-18). The Appeals Council denied Guin's request for review on September 11, 2015. (R. 1-4). Guin then filed this action for judicial review under 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of the court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court must "scrutinize the record as a whole to determine if the decision reached is

---

[3] References herein to "R. __" are to the page number of the administrative record, which is located at Docs. 9-1 through 9-13.

reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

The court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability insurance benefits under the Social Security Act, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). To be eligible for disability insurance benefits, a claimant must demonstrate disability on or before the last date she was insured. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(A)).

Determination of disability under the Social Security Act requires a five step analysis. 20 C.F.R. § 404.1520(a). Specifically, the Commissioner must determine in sequence:

> whether the claimant: (1) is unable to engage in substantial gainful activity; (2) has a severe medically determinable physical or mental impairment; (3) has such an impairment that meets or equals a Listing and meets the duration requirements; (4) can perform [her] past relevant work, in light of [her] residual functional capacity; and (5) can make an adjustment to other work, in light of [her] residual functional capacity, age, education, and work experience.

*Evans v. Comm'r of Soc. Sec.*, 551 F. App'x 521, 524 (11th Cir. 2014) (citing 20 C.F.R. § 404.1520(a)(4)).[4] The claimant bears the burden of proving that she was disabled within the meaning of the Social Security Act. *Moore*, 405 F.3d at 1211. The applicable "regulations place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Id.*

---

[4] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

# IV.  FACTS

## A.    The Medical Evidence

Guin was 60 years old at the time of her hearing before the ALJ. (R. 27). She has an associate's degree in nursing and has past work experience as a Registered Nurse. (R. 27, 29).  She alleges that she became disabled on December 21, 2010, due to symptoms related to obstructive hypertrophic cardio myopathy and mitral valve prolapse, as well as arthritis in her neck. (R. 30).  For disability purposes, her date last insured was December 31, 2011. (R. 12).  The relevant period, therefore, is just over one year long, from December 21, 2010, through December 31, 2011.

On December 13, 2010, shortly before her alleged onset date, Guin was examined by Dr. William Cox at Huntsville Cardiovascular Clinic. (R. 256-258). Guin complained of intermittent chest discomfort and intermittent palpitations, but denied any shortness of breath. (R. 257).  Dr. Cox noted that Guin had "a harsh systolic murmur at the lower left sternal border which sound[ed] more consistent with a VSD [ventricular septal defect]." (R. 258).

Dr. Cox referred Guin to Dr. James Kirklin at the Kirklin Clinic. (R. 359-60).  Dr. Kirklin examined Guin on January 24, 2011.  He noted:

> This 57 year old woman has a known history of a heart murmur for 20 years.  Over the past 1 year or so, she has noted increasing fatigue, shortness of breath walking up inclines, and occasional chest tightness.  She denies lower extremity edema or other signs of right

5

heart failure. An echocardiographic study on 1/24/11 revealed normal right and left ventricular systolic function, moderate mitral insufficiency, moderate tricuspid insufficiency, and evidence of hypertrophic obstructive cardiomyopathy.

(R. 359). Dr. Kirklin determined that in view of Guin's symptoms, "operation is advisable if we can document severe subaortic obstruction." (R. 360).

Dr. Kirklin re-evaluated Guin on August 15, 2011. (R. 275). Guin reported that her exercise tolerance had "progressively decreased" and was impairing her quality of life. (*Id.*) Dr. Kirklin noted that Guin had a history of idiopathic hypertrophic subaortic stenosis (IHSS) and that her echocardiographic studies revealed moderate mitral insufficiency. (*Id.*) He recommended that Guin undergo transaortic myectomy and mitral valve repair. (*Id.*) Guin elected to have the surgery, which was performed by Dr. Kirklin on August 17, 2011. (R. 277-78). She was discharged on August 23, 2011. (R. 288).

From August 26, 2011, through September 27, 2011, Guin was seen on a regular basis at Riverbend Family Medicine, primarily for prothrombin time (PT) tests.[5] (R. 400-420). The Riverbend records from September list "fatigue" as one of Guin's ongoing problems, but provide no discussion of the nature or extent of the fatigue. (R. 400, 402, 405, 407, 409, 411).

---

[5] Prothrombin time (PT) is a blood test that measures how long it takes blood to clot. http://www.webmd.com/a-to-z-guides/prothrombin-time#1 (last visited May 17, 2017).

6

On October 17, 2011, Guin was seen by Dr. Kirklin for a "moderate right-sided pleural effusion present in September." (R. 297). Dr. Kirklin noted that the effusion had decreased in size since September. (*Id.*). In other respects, Dr. Kirklin reported that Guin was "doing quite well," walked "two miles per day without difficulty," and had "no heart failure symptoms." (R. 297). Dr. Kirklin noted Guin's "good recovery" following surgery and recommended only "[r]outine follow up care." (*Id.*)

On November 11, 2011, Guin was examined by Dr. Michael Ridner at the Heart Center, Inc. (R. 372-75). Dr. Ridner noted that Guin had begun developing "exertional fatigue and dyspnea" the prior month and "continues to experience dyspnea with exertion." (R. 373). Guin reported "no orthopnea." (*Id.*) Dr. Ridner observed that Guin had findings of a "persistent pleural effusion on the right." (*Id.*) He also observed that Guin's surgical myectomy and mitral valvular repair appeared to have been "successful." (*Id.*)

Dr. Ridner examined Guin again on December 14, 2011, shortly before her date last insured. (R. 367-71). He noted that recent echocardiographic studies confirmed "a competent mitral valve with no signs of regurgitation," that Guin's "left ventricular function was normal," and that "[s]urgical myectomy has been successful in relieving outflow tract obstruction." (R. 368). However, Guin had also developed a "moderate degree of mitral stenosis." (*Id.*) Dr. Ridner noted that

7

Guin "continues to report exertional fatigue and dyspnea" but "has not had any orthopnea and reports no palpitations." (*Id.*) Guin also reported walking seven days a week for exercise. (*Id.*) Dr. Ridner "did not feel immediate action" was necessary and scheduled Guin to return to his office in six months. (*Id.*)

Six months later, on June 18, 2012, Dr. Ridner conducted a follow-up examination of Guin. (R. 362-63). Guin continued to report dyspnea with exertion but reported no orthopnea. (R. 363). She had no problems walking on level surfaces and was still walking seven days a week for exercise. (*Id.*) She reported "brief episodes" of increased awareness of her heart. (*Id.*) Echocardiography confirmed mitral stenosis. (*Id.*) Dr. Ridner again noted that Guin had experienced a "good surgical result from [her] myectomy" and opined that her current symptoms were primarily related to her mitral stenosis. (*Id.*)

Separate from her heart issues, Guin was in an automobile accident in 2008 and complained of neck pain following the accident. (R. 565). She described the pain as "more stiffness than anything." (*Id.*) Since then, she has received chiropractic treatment for her neck pain on a regular basis. (R. 220-254, 465-532, 576-586, 588-595). However, when Guin was examined by Dr. Cox in December 2010, she denied any musculoskeletal problems to Dr. Cox, who noted that her neck was supple. (R. 257). Her 2011 records from Riverbend Family Medicine likewise reflect a supple neck and normal musculoskeletal examinations. (R. 403,

8

414, 419). Dr. Kirklin also noted that Guin's musculoskeletal system was "grossly normal" when he examined her in October 2011. (R. 297). Guin reported "no muscle aches and muscle weakness" when she was examined by Dr. Ridner in November and December 2011. (R. 369-70, 374). Dr. Ridner noted that Guin's range of motion was normal. (*Id.*) Most recently, in April 2014 Guin was evaluated at Premier Orthopaedics for back and neck pain. (R. 637-38). Her physical examination revealed a full range of motion in her head and neck and full strength in all neck muscles. (R. 637). She was diagnosed with "mild cervical degenerative disk disease normal for [her] age." (R. 368).

Guin's medical records were reviewed by Dr. John Pataki, a state agency medical consultant, in February 2013. (R. 533). Dr. Pataki noted that the records revealed "a long history of cardiomyopathy and valvular heart disease" and that the "[c]urrent objective findings indicate a significant increase in severity which limits [Guin's] ability to sustain a 40 hour workweek …." (*Id.*) He concluded, however, that the evidence did not support an assessment that Guin was unable to function at a light level of work activity prior to her date last insured. (*Id.*)

**B.     Guin's Function Report and Hearing Testimony**

On November 18, 2012, Guin completed a function report in connection with her application for disability insurance benefits. (R. 189-96). In her function report, Guin reported that she had no problem with personal care; that she prepared

"simple meals" on a daily basis; that she "swiffered" floors for 30 minutes on a daily basis and did light dusting for 30 minutes on a weekly basis; that she did laundry on a weekly basis; that she shopped for groceries once a week with her husband's assistance; that she could walk one-quarter mile before needing to rest; that she was no longer able to go hiking; that she could only lift 10 pounds and could only walk slowly; and that she became short of breath climbing stairs and tired easily. She also reported that she went outside on a daily basis and was able to drive a car. (*Id.*)

At the hearing before the ALJ, Guin testified that she was unable to work during the relevant period from December 21, 2010, through December 31, 2011, due to symptoms related to her obstructive hypertrophic cardiomyopathy and mitral valve prolapse and arthritis in her neck. (R. 30). She testified that her heart condition causes "weakness, fatigue, shortness of breath … and palpitations." (*Id.*) She further testified that the arthritis in her neck resulted from the "whiplash injury" she suffered in the car accident in 2008 and that she has "pain, stiffness, and lack of mobility in [her] neck." (R. 30-31).

Guin testified that she was able to walk for 10 minutes, stand for 10 minutes, and sit for 15 minutes during the relevant 2010-2011 period. (R. 31-32). She was able to run errands with her husband's help, fix herself something to eat, and bathe and dress herself without help. (R. 32). She was also able to drive and did so about

once a week. (*Id.*)  She also testified, however, that she could not climb a set of stairs or do any kind of housework without help. (R. 32-33).  She said that she spent most of her days during the 2010-2011 time period resting, watching TV, and reading. (R. 34).  She estimated that in an eight-hour day back then, she probably spent 80 to 90 percent of her time resting or lying down. (R. 34-35).

## V.  FINDINGS OF THE ALJ

The ALJ found that Guin had severe impairments of cardiomyopathy and degenerative disc disease. (R. 14).  She determined that these impairments could reasonably be expected to cause Guin's alleged symptoms, but that Guin's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (R. 16).  The ALJ expressly recognized that Guin's condition had deteriorated since the date she was last insured for benefits, but determined that there was no evidence that her condition prevented her from working prior to that date. (*Id.*)  The ALJ found that Guin had the residual functional capacity ("RFC") to perform light work with the following restrictions: no work at unprotected heights; no exposure to dust, odors, fumes, and pulmonary irritants; and no work in extreme heat or cold.[6] (R. 15).

Based on the testimony of the vocational expert, the ALJ found that Guin could not perform her past relevant work. (R. 16).  She further found, however,

---

[6] Residual functional capacity is the most a claimant can do despite her impairment(s). *See* 20 C.F.R. §404.1545(a)(1).

11

that Guin was capable of performing a number of other jobs that exist in significant numbers in the national economy, including medical assistant, office nurse, and unit clerk. (R. 17). The ALJ concluded that Guin was not under a disability at any time from her alleged onset date of December 21, 2010, through her date last insured of December 31, 2011. (R. 18).

## VI. DISCUSSION

Guin argues that the Commissioner's decision should be reversed and remanded because the ALJ failed to properly evaluate the credibility of her pain testimony in finding her capable of performing a reduced range of light work. (Doc. 11 at 4-11). As a general rule, "credibility determinations are for the ALJ." *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984). "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).

To establish a disability based on subjective testimony of pain and other symptoms, a claimant must establish "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (2) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson*, 284 F.3d at 1255. If the ALJ discredits a claimant's subjective testimony regarding pain, the ALJ

must articulate "explicit and adequate reasons for doing so." *Id.* "[T]he ALJ need not cite to 'particular phrases or formulations' to support the credibility determination, … [but] must do more than merely reject the claimant's testimony, such that the decision provides a reviewing court a basis to conclude that the ALJ considered the claimant's medical condition as a whole." *Mijenes v. Comm'r of Soc. Sec.*, -- F. App'x -- , 2017 WL 1735236, *5 (May 3, 2017) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotations omitted)).

Here, the ALJ found that Guin suffered from two severe impairments: cardiomyopathy and degenerative disc disease. The ALJ determined that these impairments could reasonably be expected to cause Guin's alleged symptoms, but that Guin's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Guin contends that the ALJ's reasons for refusing to fully credit her subjective testimony are not supported by substantial evidence. (Doc. 11 at 6). She raises two primary challenges to the ALJ's credibility determination. First, Guin argues that the ALJ "mischaracterized the medical evidence and failed to properly consider [her] longitudinal medical history …." (*Id.*) Within this argument, Guin asserts that the medical record supports both her allegations of chronic fatigue due to her heart problems and her testimony regarding her neck pain. (Doc. 11 at 7-8). Second, Guin argues that the ALJ erroneously based her credibility determination on "the absence of a physician's

13

opinion" finding Guin unable to work. (*Id.* at 9). The Commissioner responds that substantial evidence supports the ALJ's credibility determination as well as her RFC determination. (Doc. 12 at 5-14).

### 1. Guin's Fatigue and Neck Pain

Guin concedes that her "window to prove disability is limited from December 21, 2010 through December 31, 2011," but argues that "the records contained in the file support [her]allegations of debilitating symptoms, specifically chronic fatigue, during this time period." (Doc. 11 at 7). While the medical record does reflect that Guin complained of fatigue throughout most of the relevant period, substantial evidence supports the ALJ's determination not to fully credit her subjective complaints concerning the debilitating effects of her fatigue.

As the ALJ noted in her decision, Guin underwent left ventricular myectomy and mitral valve repair on August 17, 2011. (R. 16, 277-78). Although Guin developed a "moderate right-sided pleural effusion" following the surgery, Dr. Kirklin noted that the effusion had decreased in size by October 2011. (R. 297). In all other respects, Guin was "doing quite well" and was walking "two miles per day without difficulty." (*Id.*) She had "no heart failure symptoms" and Dr. Kirklin recommended only "[r]outine follow up care." (*Id.*)

The ALJ assigned significant weight to Dr. Ridner's records. (R. 16). As the ALJ observed, Dr. Ridner reported on December 14, 2011, that Guin's recent

echocardiographic studies confirmed a competent mitral valve with no signs of regurgitation and normal left ventricular function. (R. 16, 368). Dr. Ridner also noted that Guin's surgery had been successful in relieving outflow tract obstruction. (*Id.*) Although Guin had developed a moderate degree of mitral stenosis and continued to report exertional fatigue and dyspnea, she did not report any orthopnea, reported no palpitations, and reported walking seven days a week for exercise. (*Id.*) Dr. Ridner did not feel that immediate action was necessary at that time (just over two weeks before Guin's date last insured). (*Id.*) When Dr. Ridner examined Guin six months later, Guin continued to report dyspnea with exertion but again reported no orthopnea and reported only brief episodes of awareness of her heart. (R. 363). She was still walking seven days a week for exercise. (*Id.*)

The ALJ also assigned significant weight to Dr. Pataki's opinion that Guin was able to function at a reduced range of light work prior to her date last insured. (R. 16, 533). Guin argues that Dr. Pataki's opinion is "inconsistent with the other evidence in the file" and that the ALJ's reliance upon Dr. Pataki's opinion "renders her finding not supported by substantial evidence" (doc. 11 at 9), but that is not the case. First of all, state agency medical consultants such as Dr. Pataki are "highly qualified physicians … who are experts in the evaluation of the medical issues in disability claims" and ALJs "may not ignore [their] opinions …." Social Security

15

Ruling (SSR) 96-6p, 1996 WL 374180, *2 (July 2, 1996); *see* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."). Second, contrary to Guin's assertion, Dr. Pataki's opinion is consistent with the medical evidence discussed above, which reflects that Guin's heart condition improved in the months following her surgery and prior to her date last insured. Third, the ALJ did not rely solely on Dr. Pataki's opinion in finding that Guin had the RFC to perform a reduced range of light work during the relevant period. Even if Dr. Pataki's opinion were given little or no weight, the ALJ's decision would still be supported by substantial evidence.

Moreover, although not addressed by the ALJ, Guin reported performing a wide range of daily activities during the relevant period. She reported preparing "simple meals" on a daily basis, "swiffering" floors for 30 minutes on a daily basis, dusting for 30 minutes on a weekly basis, doing laundry on a weekly basis, shopping for groceries once a week with her husband's assistance, walking outside every day, and driving a car once a week. (R. 32, 189-96). These activities provide further support for the ALJ's decision not to fully credit Guin's testimony regarding the limiting effects of her fatigue. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (ALJ properly discredited claimant's subjective pain

complaints based in part on claimant's reported activities during the relevant period).

With respect to Guin's allegations regarding her neck pain, the Court notes that the ALJ did not expressly address Guin's neck pain in her decision. Even so, the Court finds that Guin's testimony with respect to her neck pain is insufficient to establish that the ALJ's credibility determination is not supported by substantial evidence, much less that Guin was disabled during the relevant period.

As an initial matter, the Court observes that Guin never identified her neck pain as disabling until she testified at the hearing before the ALJ, even though she traces her neck pain to her automobile accident in 2008 and has been receiving chiropractic treatment for her pain since 2008. (R. 30, 171, 211). Even at the hearing, Guin merely testified that she has "pain, stiffness, and lack of mobility" in her neck (R. 31); she offered no testimony regarding any limiting effects of her neck pain and no testimony regarding how (if at all) the pain rendered her disabled and unable to perform any work, including a limited range of light work. In addition, the medical evidence reflects that Guin denied any musculoskeletal problems when she was examined by Dr. Cox in December 2010, and her medical records from 2011 consistently reflect normal musculoskeletal examinations. (R. 257, 297, 369-70, 374, 403, 414, 419). Indeed, Guin's most recent medical records from April 2014 reflect a full range of motion in her head and neck, full strength in

17

all neck muscles, and a diagnosis of "mild cervical degenerative disk disease normal for [her] age." (R. 367-68). Simply put, there is no evidence that Guin's neck pain would have prevented her from performing a limited range of light work during the relevant period.

In sum, based on the record as a whole, the Court finds that substantial evidence supports the ALJ's determination that Guin's allegations of disabling limitations during the relevant period were not entirely credible, and that substantial evidence supports the ALJ's finding that Guin had the RFC to perform a limited range of light work during the relevant period.

### 2. The Absence of a Medical Opinion that Guin was Unable to Work

In her decision, the ALJ "specifically note[d] that no doctor opined that [Guin] was unable to engage in work activity at any time, especially before she was last insured for benefits." (R. 16). Guin argues that the ALJ erroneously based her credibility determination on "the absence of a physician's opinion" finding Guin unable to work. (Doc. 11 at 9 (citing *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988)). The ALJ, however, did not base her credibility determination or her RFC finding solely on the absence of a physician's opinion indicating that Guin was incapable of working. Rather, she based her determination on a "careful consideration of the evidence," including the medical evidence discussed in her decision. (R. 16). *See Clyburn v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 892,

894 (11th Cir. 2014) (rejecting the claimant's contention that the ALJ gave improper weight to her treating physician's silence regarding her functional capacity, noting that the ALJ "did not base his residual functional capacity determination merely on [the physician's] silence" with respect to the claimant's limitations). Moreover, contrary to Guin's contention, it is proper for an ALJ to note the absence of a physician's opinion indicating that the claimant was disabled or unable to perform the level of work reflected in the RFC. *See Powell v. Comm'r of Soc. Sec.*, 571 F. App'x 914, 917 (11t h Cir. 2014) (holding that the ALJ articulated explicit and adequate reasons for discrediting the claimant's subjective testimony about her pain, including that the claimant "did not present any opinions from a treating or examining physician indicating that she was disabled or had limitations greater than those reflected in the RFC"); *Mayo v. Colvin*, No. 2:13-cv-0553-AKK, 2014 WL 4829555, *4 (N.D. Ala. Sept. 29, 2014) ("The court finds no error because it is proper for the ALJ to rely on the absence of restrictions in evaluating [the claimant's] credibility." (citing *Powell*)).

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner is due to be affirmed. An appropriate order consistent with this opinion will be entered.

**DONE**, this the 23rd day of May, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge